1

2         **UNITED STATES DISTRICT COURT FOR THE**

3                 **DISTRICT OF COLUMBIA**

4

5 HENRY ELMORE,

6           Plaintiff,

7         vs.

8 STAN PIETRUSIAK, in his official capacity

9 as Chair and Head of the UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY

10 COMMISSION and UNITED STATES
EQUAL EMPLOYMENT COMMISSION

11 AND JOHN DOES 1-10

12          Defendants

**Case: 1:21-cv-02347 JURY DEMAND**
**Assigned To : Mehta, Amit P.**
**Assign. Date : 8/31/2021**
**Description: Employ. Discrim. (H-DECK)**

COMPLAINT FOR DISCRIMINATION AND RETALIATION

JURY TRIAL DEMANDED

13      Plaintiff, based upon information and belief, state as follows:

14

15                 **I.   INTRODUCTION**

16     **COMES NOW** the plaintiff, Henry Elmore, acting *pro se*, and for causes of action against the

17 defendants, complains and alleges as follows:

18           **II.   PARTIES, JURISDICTION & VENUE**

19

20     1.     Plaintiff Henry Elmore resides at 150 SE 3rd Avenue, Apt 324, Miami, Florida 33131. The

21 plaintiff has exhausted all administrative remedies and performed all conditions precedent to the maintenance
of this action and is in all other respects fully qualified to maintain this action. See attached.

22     2.     Defendant Equal Employment Opportunity Commission (hereinafter referred to as Defendant"

23 or "EEOC") is a federal agency under the United States, having its principal office and place of business

24 located at 131 M Street, NE Washington, DC 20507.

25     3.     Defendant Stan Pietrusiak is the director and official agency head, having his principal office

26 and place of business located at 131 M Street, NE Washington, DC 20507.

27

28

1



RECEIVED
Mail Room

AUG 3 1 2021

4.      John Does 1-10 are persons and/or companies yet to be identified who may in whole or in part be liable for all or part of the claims set forth herein as may be revealed in discovery or investigation and/or who may be found to be necessary parties to this action.

5.      Jurisdiction is conferred on the court because has fully exhausted his administrative rights by fully participating in an administrative hearing before the EEOC and therefore is entitled to a trial *de novo*. *See* 42 USC 2000e–16(d); 42 USC 2000e–5(f) through (k) and 29 USC 794a. Under the 1991 Civil Rights Act, the time for filing a civil action after a final agency decision or final decision of the Commission has been extended to 90 days. 42 USC 2000e–16(c).

6.      Venue in this court is appropriate pursuant to Title 28, U.S.C. §1391, because the plaintiff is a resident of Florida.

7.      Plaintiff asserts claims in violation of Title VII.

### III.      BACKGROUND[1]

1.      On February 18, 2019, Plaintiff contacted the Office of Equal Opportunity (OEO) to initiate EEO Counseling. The plaintiff alleged that he had been subjected to disparate treatment and denied reasonable accommodations on the bases of race, color, sex, disability and reprisal. During an initial interview on March 8, 2019, counseling was conducted based on this claim. On March 20, 2019, Plaintiff was issued a Notice of Right to File a Formal Complaint (NORTF), because the matter was not resolved during the informal EEO process. On March 29, 2019, Plaintiff timely filed a formal EEO complaint. On May 11, 2018, plaintiff filed a formal complaint alleging that the Agency subjected him to discrimination on the bases of race, age, gender and in reprisal for prior protected EEO activity.

2.      By letter dated March 6, 2019, OEO issued the Notice of Acceptance. OEO accepted the following claims for investigation: 1)    Whether Plaintiff has been subjected to disparate treatment on the basis of disability (mental) when, on or about December 12, 2018 through the present, Agency management:

a) Failed to engage Plaintiff in the interactive process; b) Failed to provide Plaintiff with an effective accommodation; and c) Denied Plaintiff's request for reconsideration and appeal without engaging in the interactive process with Plaintiff. 2) Whether Plaintiff has been subjected to disparate treatment on the intersectional bases of race-sex (African-American male) and on the basis of reprisal (requesting a reasonable accommodation), when, on or about February 14, 2019, after participating in a teleconference on February 14, 2019, regarding Plaintiff's reasonable accommodation request, Plaintiff was notified of approval of one day of telework as a reasonable accommodation while simultaneously removing the single day of telework he already had without reasonable accommodation. By email, dated May 8, 2019, Plaintiff submitted a second OEO Contact Form, which outlined his additional complaints. Based on a review of the file, OEO determined the additional allegations are like and related to Plaintiff's original complaint, and accepted the following additional claims for investigation: 3) Whether Plaintiff has been subjected to disparate treatment on the basis of reprisal (filing of the instant complaint) when, on May 8, 2019, the Miami District Office management notified Plaintiff that his Within Grade Increase was denied.

3.      During EEO counseling, Mr. Elmore informed the EEO counselor that he was being subjected to harassment by Mr. Michael Farrell, his supervisor. The harassment came in the form of false statements regarding his performance and repeated threats that he would be placed on a PIP. Supervisor Farrell was interviewed regarding the claim.   At page 00021 of the Report of Investigation, the EEO counselor interviewed Mr. Farrell. What follows is summary of Mr. Farrell's statement regarding allegations related to time and attendance, writing style, critical elements, mid-year performance and the like:

> **PERFORMANCE ISSUES** Counselee is a GS-12 Investigator, and Counselee is being held to a GS-12 standard. A "fully successful" rating is appropriate for Counselee's work performance. There are issues with Counselee's performance with respect to Critical Element 2, Quality. Quality is measured by the percentage of cases returned to an Investigator based on poor writing or poor analysis or both. Counselee has had cases returned. Ms. Caddle informed Mr. Farrell that she gave Counselee a few cases to correct to return, and Counselee had not done so. This will be addressed in Counselee's FY 2019 mid-year performance evaluation. Counselee has issues with

---

[1] This complaint periodically references deposition testimony and the Report of Investigation prepared during the course of litigation before a contract administrative judge appointed by the defendant.  The same is attached hereto and incorporated herein as if fully set forth.

his Internal and External Communications. Mr. Farrell receives about one to two complaints about Counselee's communication per month. This issue will be addressed with Counselee in his FY 2019 mid-year performance evaluation, and it will be determined what resources can be provided to Counselee to improve his communication. There are issues with Counselee's performance with respect to Critical Element 1, Case Management. Mr. Farrell cannot recall Counselee's production rate, but Counselee is not a top producer. There have been issues with Counselee's Time and Attendance, and there continues to be issues with Counselee's Time and Attendance, especially since Counselee's move to the 16th floor. Counselee comes and goes as he pleases. There were times he did not show up for work at all. Ms. Caddle has gone to the 16th floor to see Counselee, and Counselee was not there. Recently when Counselee was Intake, Ms. Caddle contacted Counselee to do an Intake, and Counselee told her that he would be there in 20 minutes. This has been documented and will be brought up in Counselee's FY 2019 mid-year performance evaluation. Mr. Farrell cannot put a date on when Counselee's performance issues began. Counselee has been with the Agency for two to three years. Counselee was allowed an extended two to three-month leave to go to Alabama to take the bar exam. No one has taken issue with Counselee's performance until FY 2018. Mr. Farrell has always, from time to time, received complaints about Counselee from Internal and External stakeholders. Mr. Farrell has received a noise complaint regarding Counselee' television. ROI at pp 00021.

4.      The agency refused to include this claim into Plaintiff's Plaintiff.

5.      Plaintiff's first and second line supervisors, Ms. Rosemary Caddle and Mr. Michael Ferrell, respectively and Ms. Jackie Cumber, the agency's Disability Program Manager ("DPM") and Mr. Kevin Richardson, the CHCO, should have acted under the agency's policies and the provisions of the Americans with Disabilities Act (ADA) and Rehabilitation Act, which prohibits employers from discriminating against a "qualified individual with a disability" because of a disability (42 U.S.C. § 12112; 29 C.F.R. § 1630.4; 29 C.F.R. § 1630.9.), when they repeatedly denied Plaintiff an interactive process and an effective reasonable accommodation. At the time Mr. Elmore was seeking an effective accommodation, the Miami District Office was in a state of complete chaos. §§ 1.3 and 7.5. The work environment had deteriorated to the point where subordinate employees were being subjected to sexual harassment and other forms of discrimination. Supervisors either participated in the misconduct or failed to take action to redress the unlawful conduct. Mr. Elmore heard the complaints of male coworkers who were repeatedly subjected to sexual demands by a female supervisor. He testified in at least one EEO case and was requested to testify in others about his observations. The workplace was filled with hostility. There was a loss of morale among subordinate employees; a war of discontent and disgruntlement between supervisors and a cover-up by higher management officials at the Miami District Office. The work environment had become chaotic. Supervisors expressed their

4

dislike for other supervisors and were allowed to freely and openly make negative statements about each other. Ms. Caddle was a central figure in the chaos that developed in the workplace. She used her knowledge that a fellow supervisor was involved in sexual relationships with subordinate employees as a weapon for revenge against the supervisor. She claimed another supervisor was incompetent and she refused to follow directions and remain at peace with her immediate supervisor. §§ 1.3 and 7.5. Coddle Dep at pp 29-35; 109-115.

6.     Ms. Caddle managed to be hired as a supervisor when she complained she was a victim of discrimination. Caddle Dep at pp 9-20. As soon as she obtained the supervisory position, she began to misuse her authority. Ms. Caddle began to make unreasonable demands on supervisors and subordinate employees in the workplace. She demanded he terminate a romantic relationship with her daughter; she refused to grant Mr. Elmore's request to be reassigned to another unit when she knew her role as his supervisor was a conflict of interest. She falsely claimed Plaintiff's performance was poor, after she praised his performance in two prior appraisals, in order to block Mr. Elmore's request for telework as a reasonable accommodation. Ms. Caddle made no secret of her claim that Mr. Elmore's request for telework as a reasonable accommodation was an effort to "manipulate the system". Her opinion was obviously shared with Mr. Ferrell because he too claimed that Mr. Elmore's request for telework as a reasonable accommodation was an attempt to "game the system". See EX A, Ferrell Dep at pp 71-77 and Caddle Dep at pp 77.

7.     Ms. Caddle, Mr. Ferrell and several other supervisors would later come under investigation by the Commission. The investigation revealed serious problems. Supervisors were either demoted, reassigned or terminated. Ferrell Dep at pp 81-88.

8.     On June 1, 2015, Mr. Henry Elmore was hired as an Equal Opportunity (EO) Investigator (GS-7) by the Miami District Office (MIDO). From June 2015 to February 2017, Plaintiff reported to MIDO Enforcement Supervisor Fernella Peters, who rated Mr. Elmore as "outstanding" or "fully acceptable". Ferrell Dep at pp 17; 35-48; ROI at pp 11-14 and 216-245. Ms. Caddle claims Ms. Peters was an incompetent supervisor. Mr. Ferrell, who was also demoted and reassigned, contradicts Ms. Caddle's

assessment of Ms. Peters as an incompetent supervisor when she provided appraisals of Elmore. See Ferrell Dep at pp 10-29; 17-45 and 83-90.

9.      From June, 2015 to February, 2017, Mr. Elmore worked alongside Ms. Rosemary Caddle as coworkers and peers. Caddle Dep at pp 21.

10.     In late 2016, Ms. Rosemary Caddle filed an informal complaint, claiming she had improperly been denied the opportunity to compete for the position of MIDO Enforcement Supervisor. As a result of her complaint, Ms. Caddle was appointed to the supervisory position in January, 2017.  Ms. Caddle claims her demotion was precipitated by retaliation after she escalated Mr. Hernandez's report that he was victim of quid pro quo sexual harassment by his supervisor.   Caddle Dep at pp 39-51.

Caddle Dep at pp 10-13.

11.     In March, 2017, Mr. Elmore was transferred to Ms. Caddle's unit.  In 2020, Ms. Caddle was demoted from her position as supervisor and reassigned to the Charlotte District Office where she works via telework. Caddle Dep at pp 13-19; 29-33.

12.     Sometime between late 2017 and 2018, Ms. Caddle became aware that Mr. Elmore was dating her daughter. Ms. Caddle was in a conflict of interest position because of her role as the mother of a woman who Plaintiff was dating.

13.     Ms. Caddle became aware that Mr. Elmore would be testifying in EEO cases filed by Mr. Mario Hernandez and Ms. Heidy Elshater, who were subordinate employees, and members of Ms. Caddle's team. After Ms. Caddle learned that Mr. Elmore was prepared to press for a reasonable accommodation and would be a witness in EEO cases filed by Mr. Mario Hernandez and Ms. Heidy Elshater, she began to engage in retaliatory actions. She first began by claiming these employees, including Mr. Elmore, were "under-performers" and she wanted them out of her unit. Caddle Dep at pp 19-22; 73-79; *See Decl of Henry Elmore.*

14.     On December 12, 2018, Plaintiff submitted a request to telework five (5) days per week as a reasonable accommodation due to his disability (Post Traumatic Stress Disorder "PTSD") to DPM Jackie Cumber. In his request, Plaintiff notes that "office distractions" affect his disability, preventing him from

focusing on the essential job functions and tasks of the job. On December 14, 2018, Plaintiff provided medical documentation from his physician for consideration by DPM Cumber. On December 20, 2018, DPM Cumber approved one (1) day per week of telework and a private office as an alternate reasonable accommodation. §§ 1.1, 1.2, 1.3 and 7.5. DPM Cumber never spoke with Plaintiff regarding any aspect of the disability, the triggers for any symptoms he suffered or what would serve as an effective reasonable accommodation. Ms. Cumber had only been hired in September, 2018, as a Human Resources Specialist/Disability Program Manager (DPM). Ms. Cumber was responsible for assessing and processing Reasonable Accommodation (RA) requests, processing requests for personal assistant, interpreter services, reader services, RA purchases, RA reporting, and RA training. Cumber Dep at pp 32-34; 57, 63, 70, 77 and § 7.2. The agency failed to engage in the interactive process when Ms. Cumber approved an accommodation, different from the accommodation requested, without speaking with the Plaintiff. EEOC Order 560.003 states: "The DPM and employee are required to communicate about the precise nature of the problem that is generating the request, how a disability is prompting a need for an accommodation, and alternative accommodations that may be effective in meeting an individual's needs." § 7.6.

15.    Apparently DPM Cumber felt it was important to converse, as part of the interactive process, with Ms. Caddle regarding Plaintiff's alleged performance deficiencies instead of speak with Mr. Elmore about his disability and need for telework as a reasonable accommodation. Ms. Caddle's conversations with Ms. Cumber included claims that Mr. Elmore was performing deficiently in his role as Investigator. Yet, none of the appraisals supported this idea. In fact, Ms. Caddle claims Mr. Elmore's prior supervisor improperly appraised his work as outstanding. Caddle Dep at pp 52-59. At page 59, Ms. Caddle makes the following assessment of an experienced supervisor: "Q. Do you think that she was incapable of accurately assessing my client's performance? A. I would say yes. Q. Okay. And you made that clear that you felt that she was not capable of properly assessing him, fair? A. Fair." Ms. Jackie Cumber confirms Ms. Caddle informed her about Plaintiff's alleged performance deficiencies but provided no support for the allegations regarding deficiencies. Neither she nor Ms. Caddle advised Plaintiff that the alleged performance deficiencies were

being discussed and would pose a problem for the reasonable accommodation. Most importantly, Ms. Cumber did not provide an official offer of an alternate reasonable accommodation to Mr. Elmore, as set forth in the agency policies. She simply followed what Ms. Caddle wanted. Cumber Dep at pp 26-36. Ms. Cumber also never participated in the interactive process. Cumber Dep at pp 32-34; 57, 63, 70, 77 and §§ 7.1, 7.2 and 7.5.

16.     Plaintiff worked a 4/10 compressed work schedule prior to his reasonable accommodation request. He was approved to telework one day per week under the CBA Telework Program. After receiving approval to telework one day per week as a reasonable accommodation, his management removed the one day of telework he was previously approved without the reasonable accommodation. Plaintiff was moved to another office but the noise and distractions continued to be an issue, because MIDO staff often entered his office without knocking on the door and that MIDO office staff engage in loud conversations near his office. §§ 1.1, 1.2 and 7.5; Ferrell Dep at pp 60-67.

17.     On February 1, 2019, Plaintiff appealed the DPM's RA decision to CHCO Richardson. On February 8, 2019, Mr. Richardson upheld the DPM's determination to approve one (1) day of telework and a private office. Mr. Richardson also failed to engage in the interactive process when he issued his decision to deny the request for an effective reasonable accommodation on appeal. §§ 1.1, 1.2, 7.5 and 7.6. Mr. Richardson was aware Ms. Cumber had not spoken with Plaintiff and had very little information related to the nature of his disability, why the one day of telework and the private office was ineffective, Mr. Elmore's PTSD symptoms, the triggers for the symptoms and how telework would serve as an effective reasonable accommodation. Mr. Richardson was also aware Ms. Cumber had not followed procedure when she failed to offer Plaintiff an alternate accommodation. Mr. Richardson, without explanation, upheld the DPM's decision based on a known incomplete reasonable accommodation file. § 1.3. In early February 2019, DPM Cumber attempted to conduct a meeting between MIDO management and Plaintiff, after Plaintiff informed DPM Cumber she issued the determination without entering in the interactive process. Ms. Caddle refused to address Mr. Elmore's objection to the ineffective reasonable accommodation. Instead Ms. Caddle continued

to claim performance issues as an excuse for not providing an ineffective reasonable accommodation determination. *Id. After* Plaintiff raised objections to the denial of an ineffective reasonable accommodation, Mr. Ferrell and Ms. Caddle removed the telework he was approved under the Collective Bargaining Agreement (CBA) Telework Program in retaliation for requesting to telework five days per week as a reasonable accommodation and being granted telework one day per week as a reasonable accommodation. §§ 1.1 and 1.2 and EX B.

18.     MIDO management did not follow CBA policy which required MIDO management to provide a written notification to the employee being removed from telework, including the reasons for the removal. Plaintiff never received such notice from MIDO when he was removed from telework. § 1.3.

19.     As a matter of comparisons, Ms. Caddle supervised nine MIDO Investigators, including the Plaintiff. The name, race and gender of the MIDO Investigators in Ms. Caddle's Enforcement Unit are provided: Plaintiff: Black Male; Yolanda Ramirez: Black Hispanic Female; Melinda Moreno: White Hispanic Female; Mario Hernandez: White Hispanic Male; Elisa Keen: Black Hispanic Female; Maximilian Feige: White Male; Edgar Cole: Black Male; Heidy Elshater: White Hispanic Female; and Jeanette Wooten: White Female. ROI at pp 89-90; §§ 1.1, 1.2, 7.5 and 7.6. Plaintiff's coworker were allowed telework. Ms. Montero (actual name is Moreno), who was determined to be disabled (physical) was provided full time telework. EX B, Caddle Dep at pp 60-65; § 7.1.

20.     A pattern of reprisal is present in this case. On May 8, 2019, MIDO management notified Plaintiff that his Within Grade Increase (WIGI) was denied, in retaliation for contacting the Office of Equal Opportunity and filing an EEO complaint. Ms. Caddle confirms she became aware of the EEO complaint filed by the Plaintiff when, on or about March 8, 2019, she was contacted by the EEO Counselor during the informal process. Ms. Caddle states that Plaintiff was eligible for a WIGI on May 26, 2019, but she initiated and recommended postponing Plaintiff's WIGI due to Plaintiff's continued undocumented performance deficiencies. Ms. Caddle's negative statements about Mr. Elmore's performance in contradicted by the

9

statements she wrote in every appraisal she provide prior thereto.  Caddle Dep at pp 35-43; § 7.1.§ 1.4.  *See Decl of Henry Elmore.*

21.     Ms. Caddle failed to provide Mr. Elmore with performance appraisals in 2019 and 2020. As a result of Ms. Caddle's actions, Mr. Elmore has continued to be denied step increases and the ability to seek employment in other federal agencies.  *See Decl of Henry Elmore.*

**IV.     FIRST CLAIM FOR RELIEF UNDER 42 U.S.C. § 2000 AND 42 U.S.C. §1981---
DENIAL OF WITHIN GRADE INCREASES AND UPWARD MOBILITY**

22.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

23.     Mr. Elmore has a constitutionally protected property interest in federal employment and wage increases. Plaintiff met all requirements to receive wage increases but he was denied every one he was entitled to under federal law. The agency actions violated federal law. *Johnson v. United States*, 628 F.2d 187, 192, 194 (D.C. Cir. 1980); *Carey v. Piphus*, 435 U.S. 247, 266, 98 S. Ct. 1042, 1053 (1978). Also see *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985) and *Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979).

24.     Section 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. ("Section 717"), requires, in part, that "[a]ll personnel actions affecting employees or applicants for employment [in the federal government] be made free from any discrimination based on race, color, religion, sex, or national origin." Section 717 also obligates, in part, every department and agency to "maintain an affirmative program of equal employment opportunity for all such employees." In carrying out the mandate of Section 717, the Equal Employment Opportunity Commission promulgates regulations which require, inter alia, that every federal department and agency implement, and submit to the EEOC, an "affirmative employment plan" ("AEP"), which the EEOC reviews, evaluates, and approves. The AEP is intended to help monitor and address efforts and accomplishments in the recruitment, hiring, training, promotion, separation and other advancement opportunities in federal employment.

25.     The EEOC issued compliance guidance in 1987 to all federal departments and agencies in an Equal Employment Opportunity Management Directive entitled "MD-714." 4 EEOC's MD-714 obligates all

federal departments and agencies to create an "affirmative employment plan for minorities and women" which is to identify alleged instances of "manifest imbalance" and "conspicuous absence" of women and racial minorities, by gender and race, and establish "goals" and "target dates" in order to eliminate such alleged "underrepresentation" at all organizational levels.

26.     The EEOC's MD-714 makes department and agency heads accountable for the successful implementation of the AEP, and requires them in turn to review, evaluate, and hold accountable all subordinate officials, managers, and employees.

27.     In accordance with MD-714's requirements, EEOC has failed to establish certain racial goals in employment, coupled with deadlines and target dates. EEOC was required to review and evaluate managers and supervisors, and provides performance appraisals and incentives, based on achieving these goals. Managers who fail to perform may receive lower evaluation ratings, a reduced or eliminated bonus, may be reassigned or lose a grade, and ultimately may be terminated.

28.     EEOC has failed to fulfill its duties to provide wage increases to Plaintiff over the course three years; even after Plaintiff requested reconsideration, the EEOC has failed to provide wage increases all while EEOC heads failed to review and evaluate managers and supervisors, and provide performance appraisals and incentives, based on achieving these goals. Managers who failed to perform have not received lower evaluation ratings, now did they suffer reduced or eliminated bonus, or reassigned or lose a grade, and were not terminated.

**V.     SECOND CAUSE OF ACTION UNDER 29 U.S.C. §§ 701 TO 796 AND 42 U.S.C §§12101 TO 12213---
DENIAL OF AN INTERACTIVE PROCESS,
REASONABLE ACCOMMODATION AND RECONSIDERATION**

29.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

30.     The Rehabilitation Act of 1973, 29 U.S.C. §§ 701 to 796, protects against employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance. The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213, also protects against employment discrimination on the basis of a disability.

11

31.     *The Agency failed to engage Plaintiff in the interactive process;*

32.     Ms. Cumber failed to conduct an interactive process when she knew Plaintiff's mental condition was central to his need for telework. Ms. Cumber knew other employees were allowed to utilize telework as a provision in the CBA.  Ms. Cumber repeated her denial of an interactive process when Mr. Elmore filed for reconsideration of the denial of telework.

33.     There was no prior indication that Mr. Elmore had ever used or abused telework. In fact, he rarely used the one day a week of telework which had been granted to all investigators through the CBA. Mr. Elmore hoped to explain this to Ms. Cumber in the interactive process, but it never happened. Ms. Cumber never spoke with Mr. Elmore; nor did she provide him an opportunity to understand any reservations she or Caddle had concerning his request for telework.  The introductory letter sent to Mr. Elmore was not even a semblance of an interactive process. Ms. Cumber chose to only speak with Ms. Caddle and Mr. Ferrell and she ignored agency policy and federal law and hundreds of periodicals which inform her regarding what an interactive process is.  At minimum, Ms. Cumber should have spoken with Mr. Elmore so she could understand how his impairment impacted his ability to perform on the job. The interactive process is intended to allow the employee and the agency to work, back and forth together, to jointly make a determination as to what accommodation would be effective.

34.     Ms. Cumber also never allowed Mr. Elmore to explain how his disability impacted his daily life on the job. She never allowed him to convey what the stressors were which precipitated his need for telework. She only spoke with Mr. Ferrell and Ms. Caddle regarding a disability which only impacted Mr. Elmore and only he understood and had to live with on a daily basis.

35.     *The Agency denied Plaintiff an effective accommodation*

36.     Assuming arguendo that Mr. Elmore's performance was deficient, it was illogical to deny a reasonable accommodation to an employee whose disability could be accommodated in order to correct the performance deficiencies. It would be like denying an employee who suffers with poor eyesight as a disability a larger computer monitor to enable him to overcome performance deficiencies caused by poor eyesight. Ms.

12

Cumber never questioned Mr. Elmore about performance allegations; she never required Ms. Caddle to provide performance appraisals to support her bare allegations. The 2017-2019 appraisals belied Ms. Caddle's assertions that Plaintiff's performance was deficient. The assertion was nothing more than pretext. Cumber never bothered to ask Mr. Elmore how the reasonable accommodation would serve to address his disability. Instead, Mr. Elmore was relegated to an office on the 16th floor across from the employee lounge, where loud noises and boisterous laughter was commonplace.

37.     The agency had an obligation to provide an effective accommodation. Telework was provided to most employees and full-time telework to at least one employee who was disabled. See Caddle Dep at pp 60-67. The accommodation did not cause undue hardship to the agency when Ms. Montero was granted full-time telework. As illustrated by the *Enforcement Guidance: Reasonable Accommodation*, at pp. 46-47, the appropriateness of working at home as an accommodation will often depend on the nature of the employee's job. In this case, telework was allowed to others, some of whom had no documented disability. An employer must modify its policy concerning where work is performed if such a change is needed as a reasonable accommodation, but only if this accommodation would be effective and would not cause an undue hardship. Whether this accommodation is effective will depend on whether the essential functions of the position can be performed at home. There are certain jobs in which the essential functions can only be performed at the work site—*e.g.*, food server, cashier in a store. For such jobs, allowing an employee to work at home is not effective because it does not enable an employee to perform his/her essential functions. In contrast, employees may be able to perform the essential functions of certain types of jobs at home (*e.g.*, telemarketer, proofreader, lesson planner). For these types of jobs, an employer may deny a request to work at home if it can show that another accommodation would be effective or if working at home will cause undue hardship. *See Hupka v. Secretary of Defense, supra.; Langdon v. Secretary of Health and Human Services*, 959 F.2d 1053, 1060 (D.C. Cir. 1992) (remanding for consideration of whether employee's disability could be accommodated by working at home). The ADA does not require employers to have a telework program, but if one exists it must allow individuals with disabilities to participate to the same extent as other employees. Moreover, if an employer does have such

a program, allowing an individual with a disability to participate in the program can constitute reasonable accommodation. *Id.*

38.     Ms. Caddle's claims that the accommodation would create an undue burden was nonsense. A careful reading of her deposition testimony reveals the agency's reason for its treatment of Plaintiff is pretextual. Ms. Caddle's conversations with Ms. Cumber included claims that Mr. Elmore was performing deficiently in his role as Investigator. Yet, none of the appraisals supported this idea. In fact, Ms. Caddle claims Mr. Elmore's prior supervisor improperly appraised his work as outstanding. Caddle Dep at pp 52-59. At page 59, Ms. Caddle makes the following assessment of an experienced supervisor: "Q. Do you think that she was incapable of accurately assessing my client's performance? A. I would say yes. Q. Okay. And you made that clear that you felt that she was not capable of properly assessing him, fair? A. Fair." Ms. Jackie Cumber confirms Ms. Caddle informed her about Plaintiff's alleged performance deficiencies but provided no support for the allegations regarding deficiencies. Neither she nor Ms. Caddle advised Plaintiff that the alleged performance deficiencies were being discussed and would pose a problem for the reasonable accommodation. Most importantly, Ms. Cumber did not offer an alternate reasonable accommodation as set forth in the agency policies. She simply followed what Caddle wanted. Cumber Dep at pp 26-36. Ms. Cumber also never participated in the interactive process. Cumber Dep at pp 32-34; 57, 63, 70, 77 and § 7.2.

39.     The agency bears the burden of proof to show that the accommodation would impose an undue burden. The agency must provide specific evidence the accommodation would create an undue hardship. In this case, all we have is a statement from Caddle. This is not proof. As previously indicated there is no proof that Plaintiff's work performance was deficient. See 2017, 2018 and 2019 appraisals. Moreover, there is no evidence that the requested telework was not appropriate. The agency has not provided any detailed data to support its contention that such an accommodation would be an undue hardship, but, through Ms. Caddle and Mr. Ferrell, has made only general conclusory statements about performance. Considering the overall size of the agency, which during the period at issue was substantial, with a nationwide and world-wide presence; the fact that a profoundly disabled employee in the agency's Miami District Office was provided telework; and the

intent of Congress that the Federal government undertake measures to reasonably accommodate that would involve more than a *de minimis* cost; the cost of providing the telework reveals that something else was going on here. The agency has failed to offer a justifiable reason for why this did not occur.  The only alternate accommodation provided to Mr. Elmore was an office on the 16th floor, which was not effective in that it was across the hall from the employee lounge, where loud, boisterous conversations were commonplace. Nor did she communicate to him that his supervisor was alleging that he failing to perform adequately on the job; she did not allow Plaintiff to convey that his performance only became an issue after he agreed to testify in EEO cases filed by coworkers; his performance was impacted negatively by the various forms of harassment by supervisors, including a supervisors sexual relations with two subordinate male employees, the investigations of those supervisors by management, the poor leadership, the reassignment of supervisors, Ms. Caddle insistence on visiting Plaintiff at his home following an motor vehicle accident, the pressure of Ms. Caddle to "properly treat her daughter" who made repeated requests for money and the denial of his request for reasonable accommodation to escape the chaos and focus on his work.

40.    *The Agency denied Plaintiff's request for reconsideration and appeal without engaging in the interactive process with Plaintiff.*

41.    The agency was provided an opportunity to correct its earlier missteps when it failed to conduct an interactive process and provide an effective reasonable accommodation when Mr. Elmore filed a request for reconsideration. However, by this time, the agency was actively involved in disability and retaliatory harassment. The analysis for hostile environment cases based on disability is set forth in *Fetters v. Postmaster General*, 0120131553 (2013). It is well-settled that harassment based on an individual's disability is actionable. *See Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57 (1986). In order to establish a claim of harassment under those bases, the Plaintiff must show that: (1) he is a qualified individual with a disability covered under the Rehabilitation Act; (2) he was subjected to unwelcome conduct; (3) the harassment complained of was based on his disability; (4) the harassment had the purpose or effect of unreasonably interfering with his work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. *See Flowers v. Southern Reg'l Physician Serv.*

15

*Inc.*, 247 F.3d 229 (5th Cir. 2001); *see also Fox v. General Motors Corp.*, 247 F.3d 169 (4th Cir. 2001). The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. Enforcement Guidance on *Harris v. Forklift Systems Inc.*, EEOC Notice No. 915.002 (March 8, 1994).

42.   The denial of the interactive process and an effective accommodation was repeated on reconsideration. These repeated denials of an interactive process and an effective reasonable accommodation was a form of disability and retaliatory harassment. It was blatant, bold, severe and pervasive. It created a work environment abusive to Mr. Elmore. When a workplace is permeated with discriminatory intimidation of person who the agency knew was mentally impaired.

**VI.   THIRD CLAIM FOR RELIEF UNDER TITLE VII, 42 U.S.C. § 2000 AND 42 U.S.C. §1981—DISPARATE TREATMENT, REPRISAL AND DUE PROCESS VIOLATIONS UNDER CONSTITUTIONAL PROVISIONS**

*Plaintiff has been subjected to disparate treatment on the basis of reprisal (requesting a reasonable accommodation), when, on or about February 14, 2019: Issue 1: After participating in a teleconference on February 14, 2019, regarding Plaintiff's reasonable accommodation request, Plaintiff was notified of approval of one day of telework as a reasonable accommodation while simultaneously removing the single day of telework he already had without reasonable accommodation.*

43.   Plaintiff incorporates by reference paragraphs 1 through 43 above

44.   The denial of a reasonable accommodation can be viewed as retaliatory harassment. In recognizing such a claim in *Antol v. Secretary of Defense, DLA*, 01952879 (1996), the Commission explained:

The Commission has consistently held that Title VII affords all employees the right to work in an environment free from retaliatory intimidation. *See Charbonneau v. United States Postal Service*, EEOC Request No. 05930504 (August 5, 1993). The Commission has found that retaliatory harassment intended to deter an employee from filing or pursuing EEO complaints constitutes such a threat to the EEO process that, even when the Plaintiff is a former employee, "such allegations state a claim within the Commission's regulations because of the potential that retaliatory harassment may constrain other employees who desire to pursue EEO remedies." *See id.; Quinones v. Department of the Interior*, EEOC Request No. 05920869 (May 14, 1993). Appellant's complaint alleges that his Commander intimidated him in an effort to deter him from using the EEO process by discussing his EEO complaints when appellant's attorney was not present and by making clear that appellant should not file any more EEO complaints. Appellant further alleges that this was done because of appellant's sex and disability and in reprisal for appellant's prior EEO complaints.

44.     Plaintiff engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding (*e.g.*, filing a discrimination charge); (2) the agency was aware of the EEO activity; (3) the agency treated the employee adversely contemporaneous with or subsequent to her EEO activity; and, (4) there is a causal connection between the protected activity and the adverse treatment. *See, e.g., Whitmire v. Department of the Air Force*, EEOC Appeal No. 01A00340 (September 25, 2000); *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984).

45.     Retaliatory harassment does not have to be severe or pervasive to be actionable. *See, e.g., Douglas v. U.S. Postal Service*, EEOC Appeal No. 0120090284 (April 10, 2009); *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 53 (2006) (finding that the anti-retaliation provision protects individuals from a retaliatory action that a reasonable person would have found "materially adverse," which in the retaliation context means that the action might have deterred a reasonable person from opposing discrimination or participating in the EEOC charge process); *see also Lindsey v. U.S. Postal Service*, EEOC Request No. 05980410 (November 4, 1999). The statutory retaliation clauses prohibit any adverse treatment that is based upon a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity. *Id.*

46.     The EEOC Enforcement Guidance at 3 provides insight to determine whether a work environment is objectively hostile or abusive, the trier of fact must consider all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, [510 U.S. at 23; 114 S. Ct.] at 371; EEOC Enforcement Guidance at 4, 5. While the trier of fact should consider all relevant factors, no single factor is required to establish a hostile or abusive work environment claim. *Harris*, [510 U.S. at 23; 114 S. Ct. at 371]; EEOC Enforcement Guidance at 6. The Commission has indicated its belief that the *Harris* decision applies to cases involving hostile or abusive environment harassment claims on the basis of age or disability as well as to hostile or abusive environment harassment on the basis of race, gender, religion, or national origin.

47.     Ms. Caddle allowed other employees to utilize telework freely. After participating in a teleconference on February 14, 2019, regarding Plaintiff's reasonable accommodation request, Plaintiff was notified of approval of one day of telework as a reasonable accommodation while simultaneously removing the single day of telework he already had without reasonable accommodation. In the case of Ms. Montero, she was allowed to telework everyday she worked. At pp 60: "Now, were there any other employees that you supervised who were receiving telework? A. Yes." See Caddle Dep at pp 60-67.

48.     Ms. Caddle also denied two days of telework to Mr. Elmore and the office he was assigned was noisy and failed to serve as an effective reasonable accommodation. See Caddle Dep at pp 67-69. See also testimony of Ms. Cumber at pp 25-40. *See Decl of Henry Elmore.*

49.     Ms. Caddle had a history of retaliation. She claimed Mr. Elmore, Mr. Hernandez and Ms. Elshater were manipulating the system only after they participated in protected activity. See Caddle Dep at pp 70-74. Each employee had engaged in prior protected activity before they became victims of claims by Caddle that they were manipulating the system. At pp 77: "A. No. What was going on is that; again, I had three under-performers that were manipulating the system and I had a job to do." At page 78: "Q. Was Mr. Hernandez and Mr. Elmore and the other lady, Elshater -- I'm sorry about the pronunciation -- if they weren't working because of manipulating the system, weren't you really engaged in harassing conduct when you described them as manipulating the system? MR. VARMA: Objection. A. If that's how you interpret it, let it be. But that's not how -- that's not -- there was no harassment if you're wanting to get your employees to work. They need to just do what they're getting paid to do, and that's nothing -- they should not want to go to work to lay on the phone, listen to movies on their computers, putting their feet up on their desk and do everything other than opening their case files, reviewing it, analyzing it and just doing the work." See Caddle Dep at pp 93-97.

50.     When Mr. Elmore contacted Mr. Ferrell to discuss his disability and need for telework as a reasonable accommodation, Mr. Ferrell accused Plaintiff of trying to "game the system." First, Mr. Ferrell claims he did not say it. When he is reminded that the EEOC investigator reported it, he basically calls the investigator a liar. See Ferrell Dep at pp 71-75 and EX A.

18

51.     Ms. Caddle's retaliatory conduct was reflected in how she treated AT&T after her daughter was terminated by the company and later came before Ms. Caddle. See Caddle Dep at pp 79-84. Ms. Caddle was in conflict of interest position when she served as Plaintiff's supervisor while he dated her daughter. "Q. So you were led to believe at the time that Mr. Elmore -- well, you testified here in your statement, you said that, "One day I saw complaint had my daughter's phone number written on a paper, just the number." A. Uh-huh. Q. Then you questioned him about why he had the phone number of your daughter. A. Right. And he said, "That's my future wife." Q. He said this was his future wife -- A. And I told him that he better cut it out, because he was always joking. So he has this joking thing and I told him don't play with that. And I also told him that if ever he became -- if they ever did date or started going out, that he needed to tell me because he wouldn't be able to be in my unit. Q. Why not? A. Because it would be a conflict of interest. Q. Well, do you have any written documentation to corroborate that you told him that? A. No, just like he doesn't have any written documentation that I didn't. But I'm not a person that goes around lying, so I have integrity. And just a lot of the things that you're mentioning that he told you are lies. So, you know, it also comes down to who do you want to believe. But I have no reason to lie. I have no bone in this -- no dog in this fight. Q. Okay. Now, you agree you don't say anything like that in your affidavit that you had told him that if they were dating that you would recuse yourself or you would reassign him so there was no conflict, right? A. And that's -- and I should have written it in there. But if you asked him if I told him that, he would not be able to truthfully say that that conversation did not happen. But I have been with the government for 35 plus years, never a write-up, never anything. I hold my integrity above everything. I risked by job by coming forth with something that was brought to my attention, although I knew I was going to have -- you know, there may be backlash. I'm going to tell the truth and be as honest as I possibly can in every situation. So I consider myself a person of integrity and that I'm going to do my job whether it's the hard -- you know, whether it's hard or easy, I'm going to do it. I'm going to make those tough calls that some others look the other way on."

52.     Ms. Caddle was aware Mr. Elmore was in an intimate relationship with her daughter and used her authority to lord over Mr. Elmore at every turn that counted. At page 100 of her deposition she testifies:

"Were you aware that they were in a romantic, intimate relationship? MR. VARMA: Objection; asked and answered. A. No. Q. Were you aware that your daughter was requesting money frequently from Mr. Elmore? A. No. Q. You didn't know that at all; is that correct? MR. VARMA: Objection; asked and answered. A. Correct. Q. Have you ever been to Mr. Elmore's apartment? A. I have. Q. Can you tell me under what circumstances that occurred? A. When he was released from the hospital following his accident. Q. Was your daughter there too? A. No, it was a coworker. One of his coworkers and I and his sister was there and I brought food for -- I brought lunch for him and his sister who was caring for him from out of town. Q. Were you aware that your daughter had spent the night with Mr. Elmore on multiple occasions? MR. VARMA: Objection. A. No." Mr. Elmore requested a reassignment but it was denied. Ms. Caddle must have learned of the request so she used her authority to degrade Mr. Elmore in meetings and eventually pushed for his reassignment to another unit. Caddle Dep at pp 102-115.

53.    Mr. Elmore reported he was a victim of retaliation to Mr. Ferrell, his second line supervisor. At page 91 of his deposition, Ferrell testifies as follows: "A. Well, one of the meetings was about this one day of telework where he felt he was being retaliated against for asking for an accommodation, so it would have been right after that, right after Jackie Cumber's decision. One of them was after the stand-down meeting and I honestly don't remember the date. It would have been a third quarter, probably FY '18, the 3rd quarter. Q. Okay. Sometime in the 3rd quarter of 2018; is that correct? A. I would think so, FY '18 or FY '19. I would think FY '18 -- no, it may have been FY '19. Because he went out in September of '19 so it may have been FY '19. Q. Okay. A. But I did stand-down in the third quarter. Q. Now, I just want to make sure. Do you recall, sir, what the nature of the first meeting was that you mentioned? A. Yes. Q. Okay. And did it relate to his disability, sir? A. It related to his wanting another day of telework. Q. Okay. Thank you. A. On top of his accommodation. Q. Okay, sir. And so that -- you believe that the -- each of the three meetings occurred in 2019; is that correct? A. I can't -- it would be '18 or '19. It would be '18 or '19. Q. Thank you, sir... Q. And those meetings took place in your office, correct? A. Correct."

20

54.     The evidence establishes supervisors participated in the harassment, either tacitly by failing to address his reports of harassment, or in the case of Ferrell and Caddle, directly. There is also evidence that Ferrell failed to ensure an interactive process was conducted. Mr. Ferrell was accusing Mr. Elmore of "gaming' the system. Ferrell Dep at pp 71-75. Colleagues became aware of how supervisors were engaged in either sexual harassment of subordinate employees, fighting between supervisors, harassment of employees and more. This led to demotions, reassignments and discipline of supervisors. Ferrell Dep at pp 80-87. Ms. Caddle demonized Plaintiff by suggesting he was incompetent, manipulating the system in his quest for a reasonable accommodation from 2018 to the day she was demoted and reassigned. Ferrell Dep at pp 31-34; 85-88. This ragged environment caused Elmore's mental stressors, which brought on the need for the request for a reasonable accommodation, but it also caused a deterioration of his medical and psychological condition over time.

54.     Mr. Elmore's reconsideration efforts, his willingness to testify in the EEO cases of coworkers and the filing of the current EEO case only brought on reprisal. These efforts served as the predicate for reprisal. When Plaintiff filed the request for reconsideration, it intensified management's anger. When Plaintiff brought an EEO case, it took them over the top. It created a dysfunctional mentality in Caddle and Ferrell. This is when they began to claim Elmore was either trying to "game" or "manipulate" the system. EX A.

55.     One of Plaintiff's claims relates to whether he was subjected to reprisal (because of the filing of the instant complaint) when, on May 8, 2019, the Miami District Office management notified Plaintiff that his Within Grade Increase was denied. This claim is no longer before the Commission and is now before the Merit Systems Protection Board. However, there is nothing to preclude Mr. Elmore from pointing to the agency's actions concerning this claim as pattern evidence of reprisal. It was a violation of law for the Commission to discriminate against Mr. Elmore on the basis of his disability in regard to any of the following: (1) recruitment, advertising, and job application procedures; (2) hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring; (3)

21

rates of pay or any other form of compensation and changes in compensation; (4) job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists; (5) leaves of absence, sick leave, or any other leave; (6) fringe benefits available by virtue of employment, whether or not administered by the covered entity; (7) selection and financial support for training, including: apprenticeships, professional meetings, conferences and other related activities, and selection for leaves of absence to pursue training; and (8) activities sponsored by a covered entity, including social and recreational programs; and any other term, condition, or privilege of employment, including, but not limited to acts described in 29 C.F.R. §§ 1630.4 to 1630.13.

56.     The evidence demonstrates a pattern of retaliation and disability discrimination. First, Caddle callously disregarded Mr. Elmore's need for telework as a reasonable accommodation and falsely claimed, without evidence, he should not be given telework because of his poor performance; next she and Ferrell made allegations, without evidence, that Plaintiff was "gaming" and "manipulating" the system simply because he made a request for reasonable accommodation; next they sought to remove him from the unit to which he was assigned because of a bogus claim he was under-performing, while they refused to provide him with performance appraisals in 2019 and 2020; in the end they denied his Step increase and the one day of telework which every other employee enjoyed.  This is pattern evidence of retaliation. See *Buckner v. Secretary of Treasury*, 0120103052 (2011).

57.     Senior management officials should have stepped in before the damage had been done; they should have stepped in and investigated the work environment and determined that supervisors should be demoted, reassigned and disciplined before employees had been severely harmed. The work environment was deplorable and senior management knew it. Plaintiff and other subordinate employees were victims of an out-of-control group of supervisors who engaged in discrimination, sexual harassment and violations of policy and law. It was plain for everyone to see. This is why so many supervisors were eventually relieved of their positions. The only problem is that senior management acted too late. They waited and allowed Mr. Elmore and other subordinate employees to fall victim of discrimination for months and months. It was shameful that no

one stopped the chaos long before. Ferrell, Caddle and other supervisors went undisciplined for months while Elmore and many other employees were pleading for help. The application and analysis of Commission policies and the law did not require Commission employees to conduct a detailed deconstruction of Constitutional case law or an exhaustive examination of pertinent regulations to understand what their obligations were in this case. If Commission officials had simply followed Commission law and policies, the considerable harm they allowed and the resources expended in this ordeal could have been avoided.  Even now, Commission employees are attempting to cover-up what occurred and are now blaming Elmore for violations of law which Commission supervisors committed.

58.     *Plaintiff has been subjected to due process violations in how the administrative judge was selected, the biased selection, the actions taken by the biased selectee and the retaliation he was subjected after he raised concerns about the selection.*

59.     Plaintiff incorporates by reference paragraphs 1 through 59 above.

60.     Defendants have intentionally discriminated against Plaintiff on the basis of his race, disability and gender, and will continue to discriminate if not enjoined.

61.     Defendants' actions, policies and practices violate the Due Process Clause of the Fifth Amendment of the Constitution.

62.     Plaintiff will suffer additional irreparable harm if Defendants' scheme of how it selects contract administrative judges to serve in cases in which the EEOC is a party.

63.     On December 9, 2020, Plaintiff filed a Motion for Recusal of the agency's selected contract administrative judge and copied the agency's legal counsel.  Evidence suggested agency attorneys had repeated ex parte communications with the contract administrative judge. The administrative judge and agency attorneys refused to provide information as to how the contract administrative judge was selected by the EEOC and the conflict of interest which was created by that process.

64.     The Motion for Recusal cited to Martin H. Redish & Lawrence C. Marshall, *Adjudicatory Independence and the Values of Procedural Due Process,* 95 YALE L.J. 455, 475 (1986) ("The Supreme Court has often stated that the core rights of due process are notice and hearing.") See U.S. CONST. Amend. V

23

(providing that no person shall be "deprived of life, liberty, or property, without due process of law"); *id.* Amend. XIV (providing that no state shall "deprive any person of life, liberty, or property, without due process of law").  The right to be tried by an impartial judge is deeply embedded in American jurisprudence; in fact, this right has often been considered to be the cornerstone of the American legal system. Congress has authorized parties to seek disqualification on the basis of an appearance of judicial bias or impropriety. For example, the primary federal judicial statute, Title 28 U.S.C. § 455, contains a provision (§ 455 a) that calls for a federal judge to be disqualified not only when she is biased against a party, but whenever a reasonable, disinterested observed would think she might be. See *In re Murchison*, 349 U.S. 133, 99 L. Ed. 942, 55 S. Ct. 623 (1955). *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L .Ed. 2d 267 (1972). *Sierra Forest Legacy v. Rey*, 526 F.3d 1228, (9th Cir. 2008); (citing *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). *Swift v Island County*, 87 Wn.2d 348, 361, 552 P.2d 175 (1976). *Caperton v Massey Coal Co. Inc. ET, al., 556 U.S.___* (2009). In an opinion written by Justice Kennedy, the Court concluded that: *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813,821-22 (1986). And "[t]rial before an 'unbiased judge' is essential to due process." *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971); *accord Concrete Pipe & Prods. V.Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993) ("due process requires a 'neutral and detached judge in the first instance'") (citation omitted). Moreover, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). At any stage in the process, an EEO Plaintiff is entitled to the representative of his or her choosing and "the Plaintiff shall have the right to be accompanied, represented, and advised" by that representative. 29 CFR 1614.605(a). It is not necessary that either party's representative be an attorney. The use of layperson representatives is permitted in the EEO process and is common on the part of both the employees and agencies. See 5 U.S.C. § 555(b) (1966).

65.     Plaintiff requested the administrative judge relinquish her involvement in adjudicating Plaintiff's case. She has a personal stake in the matter, which means she has a personal conflict of interest. A new contract administrative judge should be appointed to adjudicate the issues. See *Wright v. EEOC*, 01A32917 (2004). The administrative judge became angry by the Motion for Recusal and became involved in reprisal.

## VII.    REQUEST FOR RELIEF

66.      Plaintiff incorporates by reference paragraphs 1 through 64 above.

67.      WHEREFORE, Plaintiff respectfully request that this Court enter a judgment for Plaintiff and award the following relief:

(a)      A permanent injunction prohibiting Defendants Stan Pietrusiak and the United States Equal Employment Opportunity Commission employees, agents, officers, representatives and servants from using the current system for hiring contract administrative judges;

(b)      A permanent injunction against Defendants and their employees, agents, officers, representatives and servants from discriminating on the basis of race, disability and gender in violation of Title VII;

(c)      A permanent injunction against Defendants and their employees, agents, officers, representatives and servants from discriminating on the basis of race, disability and gender in violation of Plaintiff's constitutional and statutory rights;

(d)      A declaratory judgment that Defendants, as heads of their respective departments, violated Plaintiff's rights to Equal Protection under the Fifth Amendment;

(e)      A permanent injunction against Defendants, as head of EEOC, and his employees, agents, officers, representatives and servants from encouraging and inducing other  departments and agencies to engage in illegal race and gender discrimination, and sanctioning and approving such illegal discrimination;

(f)      An award to Plaintiff of attorneys' fees and for costs of suit;

(g)      An award of compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(i)      An award of economic losses, including loss of wages, on the claim allowed by law;

(j)      An award of special damages in an amount to be determined at trial;

(k)     An award of punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

(l)     An award of wage increases dating back to 2019;

(m)     An award of pre- and post-judgment interest at the lawful rate; and,

(n)     An award of any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

**VIII.     PLAINTIFF REQUESTS A TRIAL BY JURY.**

August 27, 2021

RESPECTFULLY SUBMITTED,

HENRY ELMORE, Pro Se

26

1240 Winnowing Way
Suite 102
Mount Pleasant, South Carolina 29466
Telephone: 843 303-9532
Facsimile: 877 211-7549
Email: Brad@bmarshall.me
Website: Chartmans.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via U.S. Mail to:

United District Court
District of Columbia
Clerk of the Court
Room 1225
333 Constitution Avenue N.W.
Washington D.C. 20001

August 29, 2021

Respectfully Submitted
**CHARTMANS INC**

By:

_____s_____
BRADLEY R. MARSHALL
Designated Representative
1240 Winnowing Way
Suite 102
Mount Pleasant, South Carolina 29466
Telephone: 843 303-9532
Facsimile: 877 211-7549
Email: Brad@bmarshall.me
Website: Chartmans.com

# CHARTMANS INC.

Charting a New Course for Global Representation

August 29, 2021

United District Court
District of Columbia
Clerk of the Court
Room 1225
333 Constitution Avenue N.W.
Washington D.C. 20001

RE:     Request for filing of Complaint

Dear Clerk of the Court:

Enclosed, please find a pro se formal complaint, a check in the amount of $402.00 and a return self-addressed (stamped) envelope. Request is hereby made for the filing of the complaint. A copy of the filed complaint and receipt should be sent to:

Bradley R. Marshall
1240 Winnowing Way,
Suite 102
Mount Pleasant, SC 29466

Thank you kindly for your cooperation and courtesy.

Respectfully Submitted
**CHARTMANS INC**

By:

_____s_____
BRADLEY R. MARSHALL
Designated Representative
1240 Winnowing Way
Suite 102
Mount Pleasant, South Carolina 29466
Telephone: 843 303-9532
Facsimile: 877 211-7549
Email: Brad@bmarshall.me
Website: Chartmans.com

RECEIVED
Mail Room

AUG 3 1 2021

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia



ear you.

only contain
edia, and must
ms other than
weight.

CHARTMANS INC
(843) 303-8532
THE UPS STORE #6247
STE F
106 7 FARMS DR
DANIEL ISLAND SC 29492-8510

0.5 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 30 AUG 2021

Apply shipping documents on this side.

Do not use this envelope for:

**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

nts of no commercial
uments. Visit
fied as a document.

SHIP DISTRICT OF COLUMBIA
TO:  UNITED DISTRICT COURT
     333 CONSTITUTION AVE NW

Visit **theupsstore.com** to learn more
about our Print & Business Services.

st weigh 8 oz. or less.
illed by weight.

WASHINGTON  DC 20001-2804

nts of electronic media
s. Do not send cash



MD 201 9-83



UPS NEXT DAY AIR           1
TRACKING #: 1Z 165 A6F 01 3372 7143



BILLING: P/P

18H 13.00F ZZP 450 40.5A 07/2021

SEE NOTICE ON REVERSE regarding UPS Terms and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the U.S. export certifies that the commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

Serving you for more than 100 years
United Parcel Service.

  

g to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or
CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

01880250709  11/18   United Parcel Service